IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ROBERT DANIELS,

       Plaintiff,

v.                                  CASE NO. 1:13-cv-113-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered, and both parties have filed briefs outlining their respective positions. (Docs. 9, 16, 17.) For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and a period of disability on November 9, 2010, alleging disability beginning January 1, 2008. (R. 95-93; 173-74.) Plaintiff's applications were denied initially and upon reconsideration. (R. 102-105; 109-114.)

At Plaintiff's request, on August 29, 2011, Administrative Law Judge ("ALJ") Teresa McGarry conducted a hearing during which Plaintiff testified. (R. 55-89.) On October 12, 2012, the ALJ issued a written decision finding that Plaintiff was not

disabled.

On November 20, 2012, Plaintiff requested review of the ALJ's decision by the
Appeals Council.  Plaintiff attached to his request three documents, which are at issue in
this case.  (R. 29-31.)  The three documents were: (1) a Mental Residual Functional
Capacity Assessment completed by consulting physician Dr. William Beaty; (2) a Clinical
Assessment of Pain, completed by treating physician Dr. Prathima Reddy; and (3) a
Residual Functional Capacity Evaluation also completed by Dr. Prathima Reddy.  (R. 8-
14)  These documents were prepared *after* the ALJ rendered her October 12, 2012,
decision in this case.  In denying the request for review, the Appeals Council referenced
the additional evidence, and explained:

> We also looked at additional information, dated November 01, 2012
> though December 19, 2012 received from University of Florida, William
> Beaty, PhD, and Prathima Reddy, MD.  The Administrative Law Judge
> decided your case through October 12, 2012.  This new information is
> about a later time.  Therefore, it does not affect the decision about
> whether you were disabled beginning on or before October 10, 2012. If
> you want us to consider whether you were disabled after October 10,
> 2012, you need to apply again.  We are returning the evidence to you to
> use in your new claim.
> (R. 16.)

After the Appeals Council returned the additional evidence, Plaintiff, through
counsel, filed a request for reconsideration of the Appeals Council's denial of Plaintiff's
request for review.  (R. 5-7.)  Attached to the request for reconsideration were the three
returned documents. Plaintiff argued in the request for reconsideration that:

> The above referenced additional information is not 'new information' about
> a later time which 'does not affect the decision about whether you were
> disabled beginning on or before October 10, 2012.'
>
> William E. Beaty, PhD. completed the re-enclosed Mental Residual
> Functional Capacity Assessment based upon his March 11, 2011

consultative evaluation of Mr. Daniels.  Therefore, the information references March 1, 2011, a year and a half prior to the ALJ's October 10, 2012 decision.

Prathima Reddy, MD. Completed a Clinical Assessment of Plain and Residual Functional Capacity Evaluation in which she assessed the level of pain experienced by the claimant during the entire time period from January 24, 2011 through December 19, 2012, the date Dr. Reddy signed the form.  Therefore, it should be clear that the Clinical Assessment of Pain and Residual Functional Capacity Evaluation covers the relevant time frame from January 24, 2011 through the date of the ALJ's October 10, 2012 decision.
(R. 6-7.)

Plaintiff also included in his request for reconsideration a request that the Appeals Council extend the time period to file a civil action in federal court for sixty days after the Appeals Council rendered a reconsidered decision.

Because neither the Social Security Act nor the regulations provide any mechanism for reconsideration by the Appeals Council,[1] the Appeals Council only considered Plaintiff's request for an extension of time to file a suit in federal court and simply granted an extension of time.  (R. 1-3.)  This appeal followed. Plaintiff raises two issues: whether the case should be remanded in light of the evidence provided to the Appeals Council, and whether the ALJ failed to fully develop the record.  (Doc. 1.)

## II.  <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant

---

[1]See *Kinyoun v. Ribicoff*, 194 F.Supp. 528 (W.D. MO 1961)(noting that "regulations in this area do not provide for reconsideration by the Appeals Council"; *Stone v. Colvin*, 2013 WL 1811802 (E.D. KY 2013); *see also Keith v. Heckler*, 603 F.Supp. 150 (E.D. Va. 1985).

[2] *See* 42 U.S.C. § 405(g) (2000).

evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in

---

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[12]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[13]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the

---

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

national economy.[16]  The Commissioner may satisfy this burden by pointing to the

Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a

claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has

a non-exertional impairment which significantly limits his or her basic work skills or when

the claimant cannot perform a full range of employment at the appropriate level of

exertion."[18]  In a situation where both exertional and non-exertional impairments are

found, the ALJ is obligated to make specific findings as to whether they preclude a wide

range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so long

as he introduces independent evidence of the existence of jobs in the national economy

that the claimant can perform.[20]  Such independent evidence may be introduced by a

Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing

---

[16] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

such evidence.[21]  Only after the Commissioner meets this burden does the burden shift

back to the claimant to show that he or she is not capable of performing the "other work"

as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A.    Medical History

Plaintiff was treated for his psychiatric problems at Sarkis Family Psychiatry

beginning on November 8, 2010.  He was diagnosed with Psychosis Not Otherwise

Specified, meeting the following criteria: delusions of persecution, visual and auditory

hallucinations, and flattening affect, and was prescribed Abilify and Seroquel for his

symptoms.  He was treated by Kerry Creasy, a nurse practitioner at the practice.  She

stated in December 2010 that "because of the extent and severity of Robert's illness,

and due to this being the first time he has initiated psychiatric treatment, he is currently

unable to perform a job search nor is he able to work at the moment."  Nurse Creasy,

noted, however, that in the future Plaintiff may be able to seek employment.  (R. 291-

307.)

Plaintiff also sought psychiatric treatment with the ITM Group on November 2,

2010, apparently at the insistence of his wife.  Treatment objectives were developed at

Plaintiff's initial appointment, but his records reflect that Plaintiff did not show up for

further scheduled appointments.  (R. 308-13.)

Plaintiff presented to the emergency department of Shands Hospital in January of

2011 afer falling on a curb and injuring his right knee.  X-rays confirmed a tibial plateau

---

[21] *See id.*

fracture, closed, of his right knee.  Plaintiff underwent open reduction and internal fixation surgery for the fracture.  His records from the procedure note the complications for surgery that may arise due to Plaintiff's obesity.  Plaintiff was discharged a couple of days after surgery with instructions to continue his pain medication.  (R. 314-35.)

After his surgery, Plaintiff followed up with Dr. Sadasivan for treatment of his right knee.  His records show that his incisions healed nicely.  On March 16, 2011, Dr. Sadasivan completed a questionnaire that reflected that Plaintiff had gait disturbance and a limited range of motion due to his right knee injury.  Plaintiff's strength was rated a 2/5 in his lower extremities.  Dr. Sadasivan also noted that crutches were medically necessary at that time.  (R. 345-46.)

On June 1, 2011, Dr. Sadasivan noted that Plaintiff could not go back to his usual job because he was unable to stand and walk for prolonged periods without discomfort. Dr. Sadasivan advised Plaintiff that "it is highly unlikely that he will benefit from going to a labor type job.  He will need a sit-down type job to return to the work force."  Dr. Sadasivan stated that Plaintiff would need a permanent restriction with regard to his activity, consisting of a sit-down job with limited walking.  (R. 373-389.)

On March 11, 2011, Plaintiff was evaluated by consultative examiner William E. Beaty, Ph.D.  Dr. Beaty noted that Plaintiff's right leg was in a brace and he used a walker to ambulate.  Based on Plaintiff's reported symptoms, Dr. Beaty diagnosed Plaintiff with paranoid schizophrenia, with depression.  (R. 336-44.)

Plaintiff was seen by Dr. Amit Desai September 1, 2011 to January 2012 for problems with his sleep and breathing.  Plaintiff underwent a sleep study and was

advised to use a CPAP machine while sleeping.  Dr. Desai also noted that Plaintiff was trying to limit the salt in his diet and eat healthfully, but was finding it difficult, as he was always hungry.  (R. 411-432.)

Plaintiff presented to the emergency department of Shands Hospital on April 8, 2012, with complaints of pain in his right knee.  Plaintiff reported some relief from pain medication.  He was discharged with instructions to follow up with an orthopaedist. (R. 433-42.)

Plaintiff was seen by Dr. Cooke at University of Florida Physicians for his psychiatric problems.  His first appointment was on August 18, 2011.  Dr Cooke noted that Plaintiff was vague in presenting his history. Dr. Cooke's notes disclose that Plaintiff reported he had been depressed since he was a teenager and that he saw spiders and snakes on the floor, which made it hard to sleep at night.  Plaintiff also admitted to feelings of paranoia.  Dr. Cooke noted that Plaintiff admitted recent drug use. Plaintiff had not taken the Abilify and Seroquel that Dr. Sarkis had provided him.  The treatment notes also reflect Plaintiff's obesity, and that his age was older than typical for a first break of schizophrenia. Dr. Cooke wrote " this is difficult to diagnose given his history of drugs."  Plaintiff was prescribed Risperdal for his psychotic symptoms.  (R. 473-474.)

Upon his return to the University of Florida Physicians on November 27, 2011, Plaintiff was seen by Dr. Fernandes.  Treatment notes from that visit disclose that Plaintiff took the prescribed Risperdal for only one week after his appointment and then stopped because of side effects.  Plaintiff reported daily auditory and visual hallucinations.  Dr. Fernandes diagnosed Plaintiff with mood and psychotic disorders not

otherwise specialized, but also noted the possibility of secondary gain in that Plaintiff was applying for Social Security.  Plaintiff was prescribed Geodon for mood stabilization. (R. 468-74.)  When Plaintiff was seen again on January 16, 2012, he admitted to missing a few doses of the Geodon, although the medication seemed to lessen his auditory hallucinations. (R. 464-67.)  On March 19, 2012, Plaintiff stated he had been off his medications for a month because his insurance only covered mail-order prescriptions.  (R. 460-63.)

In April, 2012, his prescription for Geodon was increased to help get his psychosis under control.  Regarding his disability, Dr. Fernandes opined that "we do not believe we can comment at this time about his level of impairment as he only had been seen four times by me (due to appt [sic] noncompliance), he has not been on meds [sic] (medication noncompliance) and so cannot tell if his symptoms are in fact disabling, have limited rapport w/ and familiarity with pt, has been vague and 'pan-positive' with symptoms."  (R. 456-60.)

 On May 12, 2012, Plaintiff returned to Dr. Sadasivan with complaints that his right knee was continuing to cause him pain.  Dr. Sadasivan recommended continued use of a playmaker brace, and informed him that he would need to see his primary care physician for a refill of Percocet.  (R. 476-79.)

After that, on June 15, 2012, Plaintiff saw Dr. Desai with complaints of right knee pain.  Dr. Desai explained to Plaintiff that he did not feel comfortable giving him additional Percocet after he had been seen for pain medication in multiple doctor's offices.  Instead, Dr. Desai referred him to pain management.  Plaintiff then became

angry and stated he would be finding a new primary care provider.  (R. 497- 99.)

On July 5, 2012, Plaintiff treated with Dr. Prathima Reddy at Interventional Medical Associates for his knee pain.  Plaintiff was prescribed Percocet as it had helped his knee pain in the past.  (R. 480-96.)

**B.    Hearing Testimony**

Plaintiff was 36 years old at the time of his hearing.  He testified that he completed the eighth grade in school, but did not go further because he had been dismissed from school. (R. 61.)

Plaintiff testified about an incident where he requested Percocet from his physician, but his physician declined to fill the prescription because of Plaintiff's past drug abuse.  Plaintiff's physician noted that Plaintiff became angry and said he would be finding a new physician.  Plaintiff admitted that he did become upset, but stated it was because he was in pain, and if he was referred to a pain specialist, he would not be able to get an appointment for a month.  (R. 61-64.)

The ALJ noted during the hearing that Plaintiff frequently had been non-compliant with his doctor's suggestions and treatments plans. For example, the ALJ said that despite Plaintiff's  high blood pressure the records reflects that he was eating the wrong food and not moving around sufficiently.  With respect to his mental health, the ALJ noted that even though Plaintiff had been prescribed medications he did not take them as prescribed.  Plaintiff replied that his doctors "don't know what they're talking about," and that he ate the foods he could afford to eat, and there were times when he did not have too much to eat.  He said he had not taken medication as prescribed because he

had no income, had to pay a co-pay to get his medication, and did not have the money for it.  (R. 64-66.)

The ALJ questioned why Plaintiff stopped treating with Sarkis Family Psychiatrist in 2010, and then did not treat with anyone for two years.  Plaintiff responded that they stopped treating him because he did not pay the "money they required," and could not see anyone else because he did not have the money.  The ALJ then questioned Plaintiff on his financial situation. Plaintiff admitted that his wife worked outside the home and carried health insurance on him.  However, Plaintiff  said that he still needed to make a co-pay to visit Dr. Circus, and if he were to visit him again it would be $400 before he could see him.  (R. 67-69.)

Plaintiff stated that he hurt his right knee and leg by falling onto a curb.  After his injury he believed he could no longer even do a seated job because when he sat for thirty minutes or an hour his leg would hurt, but when he stood up he could hardly walk on it.  He stated his leg gets stuck and were stiff.  His problems caused him to become frustrated and he did not feel like he could "grasp hold of things" mentally.  He also explained that he had been dealing with mental problems for "quite a while" before his injury to his leg.  He said he used to keep it to himself, but lately it had been "coming out" and he got angry and would see and hear different things, have depression, and visions of people trying to kill him.  He also stated that he had been through a lot in his life. (R. 66-67; 70.)

Plaintiff said that his mental problems became disabling in 2008 because he started throwing things around, busting up things in his house, cursing out his wife and

shutting himself up in his room the whole day.  He would also see snakes and spiders and be "about to hurt" himself.  Plaintiff testified that he could not sleep at night because he was scared that someone would come in and kill him.  When he was depressed he did not want to be around anyone and he just cried the whole day.  (R. 70-72.)

Plaintiff testified that he was released from an eight-day stint in jail on drug charges in 2010.

Regarding his previous work, the ALJ noted that from 2000-2002 Plaintiff was working as a dietary technician at North Florida Regional Hospital.  However, Plaintiff said he went through spells of depression and there were times when he did not go to work and did not call in. He was fired for his no-shows.  (R. 72-73.)

Upon examination from his representative, Plaintiff testified that he could stand around thirty minutes at the most and he would get stiff and hurt.  He said that he wore a knee brace every day, and also used a cane.  He estimated that he could only walk about fifty yards before his leg felt like it was going to fall apart.  Plaintiff also explained that his left leg was hurting him as well because he was putting all of the pressure on it.  (R. 73-75.)

He did not think he could lift anything heavier than a gallon of milk, and had problems stretching over his head, which made it difficult to wash his hair because it would cause pain.  He also testified that he could not bend at the waist to pick up objects from the ground.  Plaintiff testified that he needed to lay down during the day and elevate his right knee because there was daily swelling, and pins and needles in his foot.  (R. 73-75)

Plaintiff stated that he was not able to assist with household chores. Regarding his personal hygiene, the most Plaintiff was able to do was brush his teeth.  His wife had to help him in and out of the shower, and help him using the commode.  He said if he went to the grocery store with his wife that he would sometimes just sit in the car. (R. 75-77)

Plaintiff testified that he watched TV during the day but could not follow along with the story, so it was mostly just on the background.  He testified that he did not read books or magazines because he could not understand them.  He was able to prepare a microwave dinner following the instructions if it was simple, but if it was long he could not understand it.  (R. 77-78.)

Plaintiff explained that his wife completed all paperwork for him because it would trigger his anger and distract him.  Plaintiff could take a simple phone message for his wife, but if it was complicated he would tell the person to call back.  He stated that he could do simple math, but was not able to help his children with homework when they were younger.  He had a driver's license, but his wife mostly drove him.  (R. 78-79.)

Plaintiff testified that during the week he did not leave his house unless he had a doctor's appointment, except for church on Sundays.  He said he would get aggravated and agitated with people in public, such as at the grocery store.  He said he did not visit friends but periodically his mother and siblings would come to visit. (R. 79-80.)

Plaintiff said that while his diabetes was controlled with medication, he still felt sick to his stomach sometimes, and felt weak.  He also stated that he had headaches every month, about twice a week, although sometimes they would last for a long time.

His CPAP machine helped him sleep at night, but it sometimes made his throat dry.  (R. 79-81.)

A Vocational Expert (VE) also testified at the hearing.  The VE explained that Plaintiff had past relevant work as a dietary aide, which was a physical demand level of medium, SVP of two.  The ALJ posed a hypothetical to the VE in which she asked about a younger individual with an eighth grade education with the relevant past work experience, with the following restrictions: could lift and carry ten pounds frequently or twenty pounds occasionally, could sit and stand for eight hours but needed to alternate body posture every thirty minutes; could walk for only two hours; could not push or pull with the right foot; could not climb ropes, ladders, and scaffolds; could occasionally climb ramps and stairs, but never bend, balance, stoop, squat, crunch, crawl, or kneel; and was restricted to work that was only one or two steps with no contact with the public and only superficial contact with coworkers and supervisors.  The VE testified that such a hypothetical individual would not be able to perform Plaintiff's past relevant work as a dietary aide, but there was work available in the national economy that such an individual could perform.  Some representative examples were a warehouse checker, a small parts assembler, and table worker.  (R. 81-85.)

The ALJ ensured that these jobs would permit someone to alternate their body posture, and the VE testified that in his experience these jobs would accommodate a thirty-minute sit/stand option.  The VE also testified that there would be no contact with the public required, and only superficial contact with co-workers and supervisors. (R. 86-87.)

Plaintiff's attorney asked whether these jobs would accommodate the use of an assistive device, such as a cane, and the VE testified that the use of one would have an impact on the ability to do these jobs.  (R. 87.)

**C.     Findings of the ALJ**

The ALJ found that Plaintiff met the insured status requirements through December 31, 2012, and had not engaged in substantial gainful activity since the alleged onset date.  The ALJ found that Plaintiff had the following severe impairments: right tibial fracture, obesity, mood disorder, and psychosis.  The ALJ determined that Plaintiff's sleep apnea and migraines were non-severe impairments.

The ALJ found that Plaintiff's impairments did not meet or equal a Listing, and with regard to his mental impairments found that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.

The ALJ concluded that Plaintiff has the residual functional capacity to perform light work, except that he is able to sit and stand for eight hours with alternating body posture every half an hour, and able to walk two hours.  The ALJ found that Plaintiff is only occasionally able to climb ramps and stairs and must avoid bending, balancing, stooping, kneeling, crouching, and crawling.  He must also avoid pushing or pulling with his right foot, and avoid climbing ladders, ropes, and scaffolds.  He must avoid heights and vibrations.

There were no restrictions with Plaintiff's hands, arms, shoulders, vision, hearing,

or communication.  With respect to his mental impairments, the ALJ limited Plaintiff to simple or two step tasks with no contact with the public and only superficial contact with co-workers and supervisors. Plaintiff was required to avoid group work.

The ALJ determined that given Plaintiff's RFC, he was unable to perform his past relevant work. However, considering his age, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.  Relying upon the VE the ALJ concluded that representative occupations that Plaintiff could perform included warehouse checker, small parts assembler, and table worker.

Accordingly, the ALJ determined that Plaintiff was not disabled through the date of her decision.  (R. 37-49.)

## IV. DISCUSSION

### A.    Remand is Not Warranted Under Sentence Six

The first issue raised on appeal is whether this matter should be remanded pursuant to 42 U.S.C. § 405(g) on the basis of new evidence – namely, the evidence that was returned by the Appeals Council without being considered.  Plaintiff asserts that the Appeals Council "abused its discretion" when it failed to reconsider the decision denying review, because "the evidence the Appeals counsel [sic] was asked to reconsider was new, non-cumulative, and strongly supported" Plaintiff's claim.  (Doc.16 at 10.)

Although Plaintiff does not expressly state in his brief whether remand is sought pursuant to Sentence Four or Sentence Six of 42 U.S.C § 405(g), remand here would be

subject to sentence six and not sentence four because while the evidence was presented to the Appeals Council, the Appeals Council never considered the evidence and instead returned it to Plaintiff's counsel. And, Plaintiff's attempt to obtain reconsideration by the Appeals Council, after it returned the materials, does not give rise to a sentence four remand because once the Appeals Council denied Plaintiff's request for review that decision was the final decision of the Commissioner. As discussed above, there is no mechanism for seeking reconsideration of the Appeals' Council decision.[22] Therefore, Plaintiff's only recourse is to appeal the Commissioner's decision to this Court and argue that the evidence was both new and material to the ALJ's decision.

A sentence four remand would only apply in a situation where the evidence was not presented to the ALJ, as here, but the evidence was both *properly* presented to the Appeals Council and the evidence was *considered* by the Appeals Council and incorporated it into the administrative record. In contrast, where the evidence is not properly presented *and* considered by the Appeals Council *and* incorporated in the record, and is then presented to the district court, the district court analyzes the case under the standard for a sentence six remand. This distinction is important because the standard for a sentence six remand differs from the standard for a sentence four remand.

The difference between a sentence six remand and a sentence four remand under 42 U.S.C. § 405(g) was clarified and explained by the Eleventh Circuit in *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3rd 1253 (11th Cir. 2007. The court in *Ingram*

---

[22] *See,* n. 1.

explained that each form of remand "remedies a separate problem.  The fourth sentence of section 405(g) provides the federal court 'power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.' The sixth sentence of section 405(g), on the other hand, provides a federal court the power to remand the application for benefits to the Commissioner for the taking of additional evidence upon a showing 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Ingram*, 496 F.3d at 1261.  Thus, in a sentence four remand the district court must determine whether the Appeals Council correctly decided that the ALJ's conclusion was not contrary to the weight of the evidence, including the new evidence submitted to the Appeals Council. On the other hand, in a sentence six remand the district court must determine that there is new and material evidence *and* that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

In this case, the Appeals Council received Dr. Beaty's and Dr. Reddy's additional reports, but expressly did not consider them and consequently did not make them part of the administrative record.  Generally, a disability claimant is allowed to present new evidence at each stage of administrative review.  *See* 20 C.F.R. § 404.900(b); *Ingram*, 496 F.3d at 1260–61.  The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if "the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently

of record." *Id*. § 404.970(b).  *Bowen v. Heckler*, 748 F.2d 629, 636 (11th Cir.1984); *see also Ingram*, 496 F.3d at 1266–69 (district court must determine whether Appeals Council correctly decided that ALJ's conclusion was not contrary to the weight of the evidence, including the new evidence submitted to the Appeals Council).  Remand is not warranted where the evidence presented to the Appeals Council would not change the outcome of the case.  *See Hoffman v. Astrue*, 259 Fed. Appx. 213, 220-21 (11th Cir. 2007) (unpublished) (citing *Ingram* and *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir.1987) (remanding because new evidence was material when new reports offered an objective medical explanation for previously unexplained subjective complaints of pain and inability to work)).  Accordingly, the Court must determine whether remand is appropriate so that the additional evidence submitted by Plaintiff can be considered.

For the following reasons, the Court concludes that the documents rejected by the Appeals Council are not new and material and would not change the outcome of the case and, therefore, remand for consideration of this evidence is not warranted.  *Caulder v. Bowen*, 791 F.2d 872 (11th Cir. 1986).

The first document which Plaintiff contends is  "new" evidence is a Mental RFC Assessment form, completed by consultative examiner Dr. Beaty.  The form requests Dr. Beaty to complete it based on his one-time examination of Plaintiff on March 11, 2011.  Dr. Beaty completed this form on December 4, 2012, *after* the ALJ rendered her decision and notably more than a year and a half *after* Dr. Beatty examined Plaintiff.  (R. 8-9.)  The form does not disclose that any additional testing was conducted or that any additional information was provided.  Rather, the form essentially recasts Dr. Beatty's

prior examination into a check-box form.  The ALJ, of course,  already had the benefit of

Dr. Beaty's actual report when she rendered her decision in the case.  That report was

expressly addressed by the ALJ, who discounted Dr. Beaty's opinion because Plaintiff

did not have any treatment history with Dr. Beaty, and his findings were not supported by

objective mental testing, but rather were based entirely on Plaintiff's self-reported

symptoms.  (R. 43.)  Because there was no further treatment, testing or evaluation

included in the December 4, 2012 form, this form was not "new."  Indeed, there is simply

no reason offered by Plaintiff why this form could not have been completed and

submitted to the ALJ prior to the hearing. In any event, even if the form had been

submitted to the ALJ or had been considered by the Appeals Council, it would not have

changed the result and therefore does not constitute new and material evidence

sufficient to demonstrate that remand under six is appropriate.

The second and third documents at issue are an RFC evaluation form and clinical

assessment of pain form, both of which were completed by Dr. Reddy on December 19,

2012. Like Dr. Beatty's form these check-box forms were prepared after the ALJ had

rendered her written decision.   On these forms Dr. Reddy was requested to complete

the forms for the time frame from January 1, 2011, to *present*.  (R. 10; 12.)  Because Dr.

Reddy completed the forms on December 19, 2012 (after the ALJ's decision) these

forms cover a time period that includes Plaintiff's condition after the ALJ had issued her

decision and concluded Plaintiff was not disabled. The evidence, therefore, includes

information that is clearly outside the relevant time period.  The forms simply do not

reflect whether the assessment relates to Plaintiff's  condition before October 10, 2012,

or whether the forms reflect that Plaintiff deteriorated – or improved – after that time.

Moreover, even assuming that the evidence concerned the time period before the ALJ's written decision, the forms would not make any difference because the ALJ already had the benefit of Dr. Reddy's actual treatment notes, which she discussed in detail, when she rendered her decision in the case. Thus, because there is no evidence that the forms reflect treatment, testing or evaluation – as opposed to simply relying upon her own treatment notes – Dr. Reddy's December 19, 2012 forms cannot be considered material. Nor is there evidence that the forms constitute new evidence of testing or evaluation. Therefore, like Dr. Beatty's records, the forms prepared by Dr. Reddy on December 19, 2012 do not constitute new and material evidence sufficient to demonstrate that remand under sentence six is appropriate.

At the broadest level this case raises the issue of whether a claimant should be permitted to submit evidence after the ALJ has rendered her decision, where the after-acquired evidence should have and could have been submitted to the ALJ before the ALJ reached her final decision. It would be unfair to allow a claimant to do so and would make administrative hearings nothing more than preliminary hearings where a claimant would not have to present all of the claimant's evidence. In the event the claimant lost the claimant could then try again by submitting more or different evidence, even though that evidence was available to the claimant in the first place. There would be no finality to the disability process. Every disappointed claimant would be encouraged to re-contact their treating and consultative examiners to obtain additional documents prepared and completed long after treatment actually took place in order to obtain a

second bite at the apple, this time with documents that should have and could have been submitted to the ALJ. That is exactly what happened here and that is why the Plaintiff is not entitled to relief in this case.

In sum, given that the ALJ had the benefit of Dr. Beaty's consultative exam report and Dr. Reddy's relevant treatment notes in rendering her decision – and the checklist assessments prepared and completed after the ALJ had rendered her decision do not provide new, material evidence –  Plaintiff's request for remand is due to be denied.

**B     The ALJ Fully Developed the Record**

Plaintiff also contends the ALJ erred by failing to develop the record by not requesting an opinion from consultative psychological examiner Dr. Beaty regarding "how, and to what extent Plaintiff Daniel's mental health would effect his ability to work, in terms of his mental residual capacity."  (Doc. 16 at 10.)  For the reasons discussed below, the ALJ did not have a duty to contact Dr. Beaty in order to fully and fairly develop the record.

It is well-settled that an ALJ has a basic obligation to fully and fairly develop the record.[23]   As a hearing is non-adversarial in nature, the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[24]   In all such cases, there must be a showing of

---

[23] Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); see also Zaldivar v. Apfel, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[24] Mason v. Barnhart, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

prejudice before remand is warranted for further development.[25]  Prejudice has been

found when the record "has evidentiary gaps which result in unfairness or 'clear

prejudice.'"[26]  An ALJ, however, is not required to order medical evidence to have a

complete record unless the record establishes that it is necessary to enable the ALJ to

render his decision.[27]

There is no ambiguity or inadequacy in the record before the ALJ in this case

which triggered a duty to further develop the record.  To the contrary, there was more

than sufficient evidence for the ALJ to make a disability determination.  The ALJ

developed a RFC based upon the record as a whole, which included, in terms of

Plaintiff's mental health records, treating source records from Sarkis Family Psychiatry,

the ITM Group, and the University of Florida Physicians, in addition to Dr. Beaty's

consultative examination.  The ALJ appropriately considered all of this evidence in

determining Plaintiff's mental RFC.  In accord with the record as a whole, with respect to

his mental impairments, the ALJ limited Plaintiff to performing simple, one or two step

tasks, with no contact with the public, and with only superficial contact with co-workers

and supervisors. (R. 41.)

Notably, the ALJ had before her for consideration Dr. Beaty's summary of his

_____

[25] Brown v. Shalala, 44 F. 3d 931, 935 (11th Cir. 1995)(  "In evaluating the necessity for a remand, we are guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.")  ; Kelley v. Heckler, 761 F. 2d 1538, 1540 (11th Cir. 1985).

[26] Brown, 44 F. 3d at 935 (quoting Ware v. Schweiker, 651 F. 2d 408 (5th Cir. Unit A July 1981)).

[27] Holladay v. Bowen, 848 F. 2d 1206 (11th Cir. 1988) (concerning the ordering of a consultative examination); Kelly, 761 F. 2d at 1540 (concerning additional medical information submitted by claimant).

evaluation of Plaintiff, which included a section entitled "ability to do work-related tasks." (R. 339.)  Thus, even if the ALJ believed further information on Plaintiff's mental residual capacity was necessary, there is no reason why the ALJ would have contacted Dr. Beaty – a one-time consultative examiner – instead of one of his treating physicians to provide this information.

Requiring the ALJ to re-contact Dr. Beaty to complete the MFRC form would not have changed the outcome because the ALJ had the full benefit of Dr. Beaty's evaluation, which she discounted. Providing the check-box form by Dr. Beaty would not have made any difference because it is the duty of the ALJ, not the consultative examiner, to determine Plaintiff's RFC.  Social Security Ruling 96-5P provides that the RFC "is based upon consideration of all relevant evidence in the case record."  SSR 96-5P, 1996 WL 374183 (July 2, 1996).  "A claimant's residual functional capacity is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive."  *Beegle v. SSA,* 482 F. Appx. 483, 486 911th Cir. 2012) (unpublished); *see also* 20 C.F.R. § 416.927.

In sum, the record does not suggest that there were any evidentiary gaps in the record such that the ALJ was unable to render a decision or such that the ALJ was required to re-contact Dr. Beaty.  The record is neither ambiguous nor inadequate. Accordingly, the ALJ developed a full and fair record and the Commissioner's decision is due to be affirmed.

# V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** in Gainesville, Florida, on the 25th day of August 2014.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.